**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
|          Plaintiff, |
| |
|          v. |
| |
| JAMES MEYER, |
| |
|          Defendant. |

Case No.: 1:13-cr-00604-JPO

## <u>SENTENCING MEMORANDUM FOR DEFENDANT JAMES MEYER</u>

Morris J. Fodeman, Esq.
Megan E. Wall-Wolff, Esq.
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
mfodeman@wsgr.com

Donna G. Recant, Esq.
230 Park Avenue, Suite 440
New York, New York 10169
Telephone:  (212) 422-0000
drecantlaw@gmail.com

*Attorneys for Defendant James Meyer*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................... 1

APPLICABLE LAW ............................................................................................................ 4

I.      A SENTENCE OF PROBATION IS AVAILABLE TO THE COURT ........................... 4

II.     RELEVANT SENTENCING FACTORS .................................................................. 4

ARGUMENT ........................................................................................................................ 5

I.      A SENTENCE OF PROBATION IS WARRANTED IN THIS UNIQUE CASE ........... 5

      A.    Jim's life has been characterized by dedication to his family, friends, and community ......................................................................................................... 5

            1.    Jim's background, education, and career ...................................... 6

            2.    Jim is incredibly dedicated to his family ...................................... 8

            3.    Jim extends his dedication and support to his friends and neighbors ....... 15

            4.    Jim is dedicated to his community, charity, and support of the arts ......... 19

      B.    The nature and circumstances of the offense ...................................... 22

      C.    ████████████████████████████████████████ ............................................ 24

      D.    A sentence of probation will alleviate any unwarranted sentencing disparities between co-conspirators ...................................................... 26

      E.    A sentence of probation would provide adequate deterrence .............. 26

            1.    Specific deterrence ...................................................................... 26

            2.    General deterrence ...................................................................... 28

      F.    A sentence of probation would be sufficient, but not greater than necessary, to achieve the goals of sentencing ..................................... 29

II.    NO FINE SHOULD BE IMPOSED .......................................................................... 30

CONCLUSION .................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Gall v. United States,
552 U.S. 38 (2007)..........................................................................5

Kimbrough v. United States,
552 U.S. 85 (2007)..........................................................................5

United States v. Adelson,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................28

United States v. Booker,
543 U.S. 220 (2005)........................................................................4

United States v. Cavera,
550 F.3d 180 (2d Cir. 2008)...........................................................4, 5

United States v. Fernandez,
443 F.3d 19 (2d Cir. 2006),
abrogated sub nom. Rita v. United States, 551 U.S. 338 (2007) ......................25

## STATUTES

18 U.S.C. § 2314..............................................................................1, 4

18 U.S.C. § 3553(a)..........................................................................4, 5, 28

18 U.S.C. § 3553(a)(1)......................................................................25

18 U.S.C. § 3553(a)(2)......................................................................29

18 U.S.C. § 3553(a)(6)......................................................................26

18 U.S.C. § 3559(a)..........................................................................4

18 U.S.C. § 3561..............................................................................4

18 U.S.C. § 3572..............................................................................30, 31

U.S.S.G. § 5K1.1..............................................................................25

Defendant James Meyer, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court in its sentencing determination in this matter, following his acceptance of responsibility and plea of guilty to one count of interstate transportation of stolen property in violation of 18 U.S.C. § 2314.

## PRELIMINARY STATEMENT

Jim Meyer stands before the Court as a devoted husband and father and a respected member of his community who is beloved by his family, friends, and neighbors. He has accepted responsibility for a serious crime that reflects a profound lapse in judgment in an otherwise loving, generous, and altruistic life. Jim knows that his conduct has destroyed the fulfilling professional life that he has worked tirelessly since childhood to build, and has caused extensive distress and turmoil in the lives of his family and loved ones.

Jim will forever regret his poor choices and the devastating impact they have had on everyone around him. Most of all, he is deeply distressed by the consequences that will affect Amy, his wife of almost thirty years, and his children, Scarlet and Forrest, who are just beginning to make their way in the world. Jim, Amy, and their children are a particularly close and loving family, and the loss of Jim's steadfast encouragement, love, and support during a potential term of incarceration would be devastating to their well-being. The additional economic penalties associated with Jim's sentence will wipe out the family's assets, and it will be very difficult for them to start over, which will surely cause enormous hardship and affect their lives for decades to come.

Jim and Amy have also always opened their home to extended family, friends, neighbors, and anyone else who needed it, and their household has served as a home base for many in the community over the years. This sanctuary of support and caring has been destroyed as a result of

Jim's arrest for his crimes, and the community has been permanently altered for the worse. Needless to say, this has all been emotionally devastating for Jim and Amy.

Jim is profoundly remorseful, and wishes to do everything in his power to atone for his mistakes. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████ However, Jim recognizes that, ████████████████████████████████████, he has irrevocably damaged his own life and lives of his loved ones, and that he and his family will continue to suffer the attending consequences for a long time to come. Since he was very young, Jim wanted nothing more than to pursue his artistic potential, become an artist, and devote his life and energy to supporting the arts. Through sacrifice and hard work he was able to find a place in the art world and dedicate his energy and time to the creation of art. As a result of Jim's regrettable decision, he has been shunned by that world, and knows it is almost certain that it will be a very long time before anyone in that field will ever work with him—or trust him—again. He has thus jeopardized and possibly destroyed his life's dream, and it is entirely of his own doing.

Nonetheless, Jim remains hopeful that he can learn from his mistakes and eventually rebuild a life dedicated to supporting others, giving back to his community, and recognizing and encouraging the artistic potential in young people. As the dozens of letters submitted on his

behalf make clear,[1] Jim has otherwise devoted his life to altruism. Jim is currently focused on atoning for his misconduct; he is committed to serving his sentence, paying his debt to society, and rectifying the harm he has caused in any way he can. But Jim is hopeful that he can start a new phase of his life and rededicate himself to his family, his own art, and the broader community.

It is our hope that this memorandum can provide the Court with a more complete understanding of Jim's character and circumstances over the course of his life. Jim is a fundamentally kind, generous, sensitive, and loving person whose otherwise exemplary life has been marred by the disastrous decision he made in this case. He is by all accounts deeply committed to his wife, children, family, friends, neighbors, and community, and is a source of love and support to countless people. For the reasons set forth in detail below, we respectfully submit that incarceration is both unnecessary and unwarranted in this case, and that the Court should instead sentence Jim to a period of probation.[2]

Jim is a good man who made a terrible mistake. As the Court is aware, imposing a sentence is an enormous responsibility, and requires the careful consideration of a wide range of complex factors. Jim is profoundly remorseful for his conduct and awaits his sentence as someone who has taken responsibility for the impact of his actions on himself and those he loves, understanding that they are entirely his fault. The outpouring of support from Jim's family and friends make clear that his offense is completely at odds with his true character and the

---

[1] The letters submitted in support of Jim are appended hereto as Exhibits 3 through 70.

[2] Jim is also fully prepared and willing to perform community service in conjunction with a probationary sentence in an amount to be set by the Court, should the Court deem it appropriate. Should the Court determine that a sentence of incarceration is necessary, we respectfully request that the sentence be served under house arrest, so that Jim can still work to support his family.

example he has set throughout his life, and we ask the Court to consider the entirety of Jim's

circumstances before imposing sentence.

## APPLICABLE LAW

## I.    A SENTENCE OF PROBATION IS AVAILABLE TO THE COURT

18 U.S.C. § 3561 provides that "[a] defendant who has been found guilty of an offense

may be sentenced to a term of probation unless – (1) the offense is a Class A or Class B felony,"

or "(2) the offense is an offense for which probation has been expressly precluded". 18 U.S.C. §

3559(a) provides that a Class A felony is defined as a felony where the maximum term of

authorized imprisonment is a life sentence, and a Class B felony is defined as one where the

maximum term of authorized imprisonment is twenty-five years or more.

Because Jim pleaded guilty to one count in violation of 18 U.S.C. § 2314, which provides

a maximum term of imprisonment of ten years, his offense classifies as a Class D felony under

18 U.S.C. § 3559(a). Moreover, 18 U.S.C. § 2314 does not expressly preclude probation.

Therefore, the Court is free to impose a probationary, rather than incarceratory, sentence.

## II.    RELEVANT SENTENCING FACTORS

The Supreme Court has made it clear that the Sentencing Guidelines are advisory. United

States v. Booker, 543 U.S. 220 (2005). A defendant's Guidelines range is therefore just one of

many factors that the Court must consider when imposing a sentence, and the Court "may not

presume that a Guidelines sentence is reasonable[.]" United States v. Cavera, 550 F.3d 180, 189

(2d Cir. 2008) (en banc).[3] Instead, the Court must conduct its own independent review of all of

the relevant factors, considering any and all information relating to the defendant's background,

---

[3] The parties and the Probation Department are in agreement that the applicable advisory Guidelines range in this case is 37 to 46 months imprisonment. However, under the terms of the plea agreement, attached hereto as Exhibit 1, either party may seek a sentence outside the advisory Guidelines range based on the factors to be considered in imposing sentence pursuant to 18 U.S.C. § 3553(a).

character, and conduct, and "make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 49-50 (2007). A sentence must be sufficient but "'**not greater than necessary**' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)) (emphasis added), and a sentence is inappropriate where it exceeds the minimum sentence necessary to achieve its purposes. See Cavera, 550 F.3d at 189.

The relevant sentencing statute, 18 U.S.C. § 3553(a), sets forth a number of factors that the Court must consider when imposing a sentence. Among other things, those factors include the history and characteristics of the defendant, the nature and circumstances of the offense, the kinds of sentences available, whether the sentence reflects the seriousness of offense, promotes respect for the law, provides just punishment, and affords adequate deterrence, the need to avoid unwarranted sentence disparities, and the need for restitution. Id. We analyze each of these factors below.

## ARGUMENT

## I.    A SENTENCE OF PROBATION IS WARRANTED IN THIS UNIQUE CASE

### A. Jim's life has been characterized by dedication to his family, friends, and community

Jim Meyer is a fifty-three year old man who has lived an otherwise law-abiding and exemplary life devoted to his family, friends, neighbors, and community. He has provided an open home to anyone who needed it, and served as a surrogate father figure to many of the young people in his life who, like him, struggled to fit in and make their way in the world. He has also devoted his life to supporting and encouraging the artistic potential in others.

### 1. Jim's background, education, and career

Jim was born in Lynwood, California, and was adopted by Charles and Dorothy Meyer when he was seven days old. The Meyers also adopted Jim's younger brother, Keith, and the family subsequently moved to Northport, Long Island, where Jim and Keith grew up.

The Meyers were a typical middle class family—Charles worked in life insurance and Dorothy was a secretary for the Veteran's Administration. Charles was strict with his sons and had traditional ambitions for their careers. However, Jim was a very sensitive, shy, and creative child, and often felt that he failed to live up to his father's expectations because he focused on artistic subjects rather than academics. He suffered from dyslexia, and struggled to keep up in school. Jim's adoptive status and Mexican heritage also made him feel ostracized from his ethnically homogenous community, and he would often withdraw from the real world to find comfort and respite in the world of art. As his mother, Dorothy, recalls:

> Growing up, his personality and traits were well defined. Jim has always been kind, loyal, loving, artistic, sensitive and hard working . . . He was kind almost to a fault. He would be first in line for an event and ended up shut out because more aggressive students pushed ahead of him. I often paid for books that were stolen from him by other students. Any negative report from the teachers usually involved his day dreaming, not paying attention in class or drawing too much on his reports.

Ex. 3, Dorothy Meyer Ltr. at 1.

Rather than becoming angry or jaded by his experience at school, Jim instead chose to dedicate his life to helping others, particularly those who were introverted or withdrawn. He continued to pursue his passion for art and as a teenager reached out to other students who found themselves on the fringes of high school social life. As his daughter, Scarlet, explains:

> Anyone who knows my dad knows he has a particular passion for helping young people, which I believe comes from his past. My dad grew up in a time when dyslexia was not frequently diagnosed,

> he struggled with school and was often labeled a "bad kid" simply
> because his sight would not allow him to read or understand his
> lessons. However he always had a passion and talent for the arts,
> and was able to find comfort and solace in the art room at his high
> school.

Ex. 4, Scarlet Meyer Ltr. at 3.

Against the wishes of his parents, Jim applied to the School of Visual Arts when he

graduated from school. Charles and Dorothy refused to pay his tuition, so he worked full time to

support himself while attending college. Unfortunately the financial burden eventually proved

too much, and a combination of the financial strain and Jim's own yearning desire to begin a

career in the arts led to his withdrawal during his sophomore year.

At nineteen years old, Jim had to figure out a way to make a career for himself without a

college degree. He worked at a variety of jobs to support himself while still making time to help

others and give back to his community. One of his early jobs was as a nurse's aide at a nursing

home for adults with cerebral palsy. The empathy and support Jim showed to his patients helped

win the lifetime devotion of Amy Jenkins, a friend from his hometown and Jim's future wife.

Amy recalls a significant moment from the young couple's courtship:

> [Jim's patients] were thrilled to be with Jim who took them out and
> did normal errands with them. I was petrified. I watched Jim laugh,
> joke and nurture these men, but most of all, treat them as valuable
> humans. They loved him. I learned that day how strong and brave
> Jim was, how unconditional his love was, and how willing he was
> to appreciate what others would see as throw away people.
> Through Jim's actions I was able to recognize my own failings and
> see these men as individuals with the strengths and weaknesses we
> all possess. I was humbled.

Ex. 5, Amy Jenkins Ltr. at 2.

Such devotion to others would be a hallmark both of Jim's career and community

involvement throughout his life—he knew what it was like to feel like an outsider. As his

7

daughter explains, "[m]y dad knows what it is like to be the kid that society saw as useless, and fully understands the pain that comes with that kind of label. Because of this he sees value in the people that most of society would dismiss."  Ex. 4 at 4.

Even while working, Jim always set aside time to create his own art. He and Amy married in 1986, and a few years later Jim became a full-time assistant to Jasper Johns, a position he held for over twenty-five years. Although the job was extremely time-consuming and involved a hectic and unpredictable schedule, Jim found time to create, whether in the very early hours of the morning or late at night after his work had concluded.

However, although Jim was always dedicated to his craft and spent long hours at work, his primary focus in life has always been on his family and his community.

### 2.  Jim is incredibly dedicated to his family

Jim and Amy married young, and have now been married for almost thirty years. They have two children, Scarlet and Forrest. Jim and Amy always put family first, and their devotion to each other is an inspiration to everyone who knows them. As Amy's sister, Kristine Jenkins, explains, "Jim and Amy's love and marriage are inspiring to everyone around them. I am grateful that my daughter has been able to witness the example they set for enduring commitment, friendship and love between two people." Ex. 6, Kristine Jenkins Ltr. at 1.

Amy's sister, Linda Jenkins, echoes this sentiment when she writes that she has "witnessed Amy and Jim's lives together, as they navigated being young newlyweds, new parents, and professionals. They are an incredibly loving and strong team who have lived their lives nurturing and caring for their family and for others in their community. They have been an example to all of the lives they've touched." Ex. 7,  Linda Jenkins Ltr. at 3. Jim's mother, Dorothy, is struck by the couple's love and respect for each other after thirty years: "it still

amazes me to see them reconnect at the end of the day, sharing information as if they had been separated for a month rather than a day." Ex. 3 at 2-3. See also Ex. 8, Alanna Mulligan Ltr. at 3 ("Amy is one of my best friends. She is the light of Jim's life. Their love is astounding. They are the perfect compliment to each other and can handle any task at hand, together").

Although Jim's indictment and guilty plea have put him and his entire family under incredible strain, his marriage to Amy has remained strong. As John Fitz, Jim's brother-in-law, writes, "[t]he situation in which Jim finds himself now would strain even the best of relationships. Although I know it has not been easy for either Jim or Amy to go through this, I have seen their love and commitment grow stronger despite it all." Ex. 9, John Fitz Ltr. at 2.

In addition to his devotion to his wife, Jim has always shown incredible love and support for his two children, who are the center of his life. Amy writes that "Jim as a father is inspiring, his love, patience, compassion, work ethic, and communication with his children is a beautiful thing to see. Jim takes his role as parent as his most sacred role." Ex. 5 at 2.

As Jim's daughter explains:

> I've always had a close relationship with my father. He is my parent, he is my protector, he is my mentor, and he is my friend. I love him more than words can express. All of my life he has been there to guide me through life's knocks and hardships. I can talk to him about any subject for hours on end, and him to me. My dad likes to joke that before I could talk he couldn't wait for me to say my first words. He kept wondering what they would be, but then that day came, and I never stopped talking. This fortunately or unfortunately, is pretty accurate. Though I've always been outwardly shy, I've never been that way around my dad. From an early age I have memories of following him back and forth throughout the house talking to him about everything under the sun, and him patiently listening and conversing back. Somewhere in a box in our basement there are hours of VHS footage of me as a child following my dad around, talking non-stop.
>
> Now that I'm an adult, the idea of a small child following me around and asking me every question they can think of sounds

9

> maddening, but my dad is better than me in that way. Whereas I would probably tell that little girl to go watch TV, he has always been so happy to have me around that he would never tell me leave. Now that I'm in my early twenties the nature of our relationship has not changed much. I call him several times a week (sometimes a day) for advice, just to talk, or because I miss him. Wherever he is and whatever he is doing he'll pick up the phone and put his day on hold just to talk to me.

Ex. 4 at 1-2.

As Jim's son, Forrest, recalls, "[m]y dad was the only person I felt I could talk to about what I felt most passionate about in life. . . [My father] has and [] always will be my best friend. I cannot imagine what my life would be without him being an ever present factor." Ex. 10, Forrest Meyer Ltr. at 1-2.

Jim's love for his children is widely known in his community. The letters of dozens of Jim's family members, friends, and neighbors contain similar sentiments about his devotion to his children. Jim's niece, Vera Bergeron, observes:

> My Uncle is one of the best men I have ever known. I have never experienced anything from him other than a kind word, a funny joke, or loving action. He has been the best father to his two children. . . He is always ready to give a hug when they're down and is genuinely interested in what is going on in their lives or the lives of my siblings and me. Over the years seeing my Uncle and my Aunt together has been a true inspiration to me in my life. Their ability to love and support each other even the toughest times is something I strive for in my own marriage. His loving spirit has made it impossible for anyone to dislike him. It is a common statement among the next generation of women in my family to say, "I want my own Jim Meyer."

Ex. 11, Vera Bergeron Ltr. at 2.

Jim's friend, Kirsten Hunter, explains that "Jim and Amy, as parents, were a team from the start. They made it look easy, and fun. For Jim, family is first not because of obligation, but

because of love. His children and his marriage are certainly his most prized accomplishments."
Ex. 12, Kirsten Hunter Ltr. at 1.

Despite a difficult relationship with his father when he was younger, Jim has worked on reconciling and establishing a stronger bond. Likewise, Jim's father has come to appreciate his son's sensitivity and emotional vulnerability. Over time Charles has come to recognize that "Jim's strongest asset is the manner in which he fulfills his role as a husband and a father. He has exceptional respect for his wife, Amy, and has always interacted with his daughter and son in a calm and adult manner. He detests jokes of any kind, dislikes teasing, and is non-prejudicial. Oh, how I envy him!" Ex. 13, Charles Meyer Ltr. at 2.

Jim has also extended his love and support to his other family members during difficult times, including to his late younger brother, Keith. When Keith was eighteen years old, he was sentenced to prison for a drug-related crime. Jim and Keith's parents moved to California during Keith' incarceration, but Jim stayed behind and supported his brother. As Amy recalls:

> During that time, Jim was Keith's only support or family. While Jim's mother secretly sent money for Keith's legal defense, Jim, at the age of 21, found Keith a lawyer, bought him a suit, and made sure that Keith turned up for all his court appearances. Jim never wavered in his support of Keith and never lost his cool with a frightened young man who wanted to hide and run away. Again I was humbled by Jim's actions, compassion, and steadiness.

Ex. 5 at 2.

████████████████████████████████████████████ Jim supported Keith through his prison sentence and long illness, and cared for him until his death at the young age of thirty-one. Jim was devastated at the loss, and did everything he could to love and care for him while he was alive. Beverly Behrmann, a high school friend, recalls Jim's dedication to his younger brother:

11

>Jim was Keith's main support through the legal process and remained his emotional and psychological support while Keith served his sentence. . . Upon Keith's release, Jim continued to provide emotional, psychological, and logistical support in Keith's transition from prison to community under such extreme circumstances. Jim stayed a positive force and solidly stood by his brother until his death.

Ex. 14, Beverly Behrmann Ltr. at 1. Scarlet explains the impact Keith's death had on her father's

life:

>Keith was my dad's brother and his best friend growing up. Keith died at an early age, and was considered a wayward youth by most standards. Keith was troubled, addicted to drugs, and in prison before the age of twenty. My mom and dad visited him as much as they could and eventually provided a home for him when he was released from prison, even though they were both in their early twenties and without means, and were caring for someone who was only slightly younger than them. ██████████████████
██████████████████████████████████. My dad was devastated. I know he wishes he could have done more for him, even though he did as much as he could when he too was only a young man without means. Between his experience and his brother's he knows that often the difference between success and failure in a person's life is a safe space to be after school, a warm meal, or a ride to a the train station. My dad knows the power of chances, and what they could mean in a person's life.

Ex. 4 at 4.

Jim's love extends far beyond his immediate family, and in fact Jim and Amy have

consistently opened their home to not only their many relatives, but to their neighbors,

community, and anyone else who needed a place to stay. Jim's brother-in-law describes the

impact that Jim and Amy's creation of an open and loving home has had on the entire family:

>They have always graciously opened their home for the entire Jenkins family, the in-laws, and any and all friends of theirs that needed a warm and loving place to spend the holidays. My four children, the children of Jim and Amy, the children of Tom Jenkins, and the daughter of Kristine Jenkins, have all grown very close under the umbrella of this loving extended family. It has been

> particularly amazing for me to watch, coming from a much smaller family myself. The nine "Cousins," as the family calls the next generation, all look out for each other and spend a lot of time together independent of family gatherings. This is especially rare in today's society, and Jim has been a big part of fostering that closeness between the Cousins.

Ex. 9 at 1-2.

Carol Jenkins, Amy's mother, describes Jim's constant presence in his family members' lives, and the impact even small gestures can have when someone is struggling:

> Jim has always supported members of our family in a million ways. Some large and some small. He has provided work when work was needed, he has welcomed members who needed a place to stay. He has listened to us talk and given us good feedback. He never tells us what to do, but by being a good listener, he has helped us find our own paths. He is a warm and loving father, spending a great deal of time with his children as they grow and find their own paths. While he makes new friends, he also retains those friends who have been in his life since high school. He is really an important person to us all.

Ex. 15, Carol Jenkins Ltr. at 2-3. See also Ex. 16, Eric Jenkins Ltr. at 2 ("He often was more concerned with my life than I was").

Kristine, Amy's sister, describes the incredible devotion Jim has shown to his extended family members, and particularly the emotional support he has provided to those with less stable home lives:

> [Jim is] a wonderful uncle to each of his 7 nieces and nephews. My daughter, at 12, is the youngest of these. As a single mother, Jim's quiet, unwavering encouragement and support have meant more to me - and to my daughter - than I imagine he even knows. Jim is the kind of person who will notice that a little girl is feeling left out, or sad, and will offer to take her on a fun adventure. Jim did that one day this past summer, surprising my daughter with a dinghy ride to explore a beach and sand dunes, teaching her how to steer an outboard motor and making her feel special and cared about. Such things mean a lot to a girl with no father. . .

13

Jim often saves the day with good advice or a thoughtful deed - always without fanfare, just pure kindness. I am sometimes overwhelmed by the everyday tasks of providing for, and raising, a daughter on my own. Jim is a calm, helpful friend in such situations. Recently, I lost health insurance coverage for my daughter, and I was in a panic. The experts I had consulted could find no way for me to insure her without a lapse in coverage. Jim, having heard about my situation, sent a supportive note along with information on temporary insurance plans. It may seem a small matter - but to me this was a huge help. My daughter now has health insurance - and as a very active girl - currently recovering from an injury - she really needs it. This is typical of Jim. He is the person you can turn to when something goes wrong. Jim is loyal and steadfast, and this is evidenced by the friendships Jim has maintained with people from all stages of his life. It is rare to see a person who has so many true and active friendships. I think this speaks volumes about Jim's character and way of being in the world.

Ex. 6 at 1-2.

Kathryn Stater, Jim's cousin, expresses similar sentiments regarding Jim's response when her family had to deal with the long illness and untimely death of her husband:



At the time I had 3 very young men to raise and a sick husband to take care of. Jim and Amy provided emotional support that I couldn't have lived without.

My husband, Mark Stater, passed away on May 31, 2014. Jim Meyer has been a rock for my entire family. Jim's kindness is not singular. He has touched so many lives with his warm and loving

14

soul; his absence would prove to be a void that is unimaginable to
me.

Ex. 17,  Kathryn Stater Ltr. at 1. <u>See</u> <u>also</u> Ex. 18, Ann Arensberg Ltr. at 1 ("since [my husband's]

death, Jim was one of the first people to offer me the kind of practical help I needed. He has an

excellent heart").

### 3.  Jim extends his dedication and support to his friends and neighbors

Jim extends the same consideration and concern to his friends and neighbors, and has

done so since a very young age. His childhood friend, Patrick Bishow, writes of the kindness Jim

showed to him as early as elementary school and that continued throughout their lives:

> Not knowing anyone starting 6th grade can be quite intimidating to
> a child. I remember crying each morning coming to school. That is
> until I met Jim Meyer. He was quick to make friends with me,
> which made my school experience a whole lot better. He
> introduced me to his friends (which were many) and with his
> endorsement, they became my friends too. Jim has been a loyal
> friend ever since.
>
> He was also there when my son was born. Attending life events, he
> always knew that being there physically was incredibly important.
> I remember I had a screening two and a half hours away from
> where he lived, he came out anyway (even though he had already
> seen the film). It was important for him to be there, because he
> knew it was important to me.
>
> He was always helpful in giving his time to help me with my
> projects and ALWAYS supported my work. . . He would always
> make it to a premiere or art event to show his support for your
> work or the work of others.

Ex. 19, Patrick  Bishow Ltr. at 1. <u>See</u> <u>also</u> Ex. 14 at 1("This is the kind of person James Meyer

is—one who will go the extra mile in order to help someone, be it friend, family, community

member").

Jim has made and retained friends from all walks of life. Jim became sober in his early

twenties and joined Alcoholics Anonymous, where he continued to forge meaningful

connections that went beyond meetings. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

Anne Day, Jim's neighbor, describes the sense of closeness and cheer that Jim and Amy

brought to the entire neighborhood:

> He and his wife Amy always were the center of activity for the
> annual Halloween trick or treating in his neighborhood. In addition
> to helping the kids design interesting and unusual costumes, Jim
> generously cooked and prepared a hot meal for the cold and tired
> parents on Halloween night. Even not at Halloween, the Meyer
> home was always welcoming and friendly.

Ex. 21, Anne Day Ltr. at 1.

Many of the people who wrote letters in support of Jim speak of his extensive offers of

support in times of need. Alanna Mulligan, a family friend, writes of the generosity and warmth

that Jim and Amy showed to her family when their power cut out:

> In 2012, we had an unexpected snowstorm that left my family
> without power at our home for 10 days. Jim immediately gave us a
> portable heater to use to heat our house, had us over for warm
> meals and let us shower at his house. I know that I can always call
> him if I'm in a dire straight and he will help me figure out a
> solution. Jim has always extended an invite to my mother, sister
> and I for holidays and celebrations with his family. Some of my
> most cherished memories are of spending Halloween and
> Christmas Eve with Jim, Amy, Scarlet and Forrest. They are the
> type of people whom you instantly feel comfortable around. I
> consider his family to be a part of my own. I know they will
> always be in my life.

Ex. 8 at 3. Amanda Hower, Jim and Amy's neighbor, had a similar experience:

> The examples are many, but one that stands out in my mind is
> when, following a large snowstorm during October 2011, my

16

> family lost electricity but the Meyer's house still had it, they were happy to let me use their house as a sort of base camp while I was struggling to find a way to carry on my daily life. Jim has always been that kind of neighbor that will be there to help you out if you are in need. . . [T]o think of the prospect his community or family could be missing someone as kind, generous, intelligent, dedicated and hard-working as Jim for any amount of time. Losing the warmth and stability that Jim and Amy not only cultivated within their own family but shared so readily with others would deliver such an awful blow to that family and the entire community.

Ex. 22, Amanda Hower Ltr. at 1-2.

Jim's friend, Jed Marcus, was also touched by Jim's generosity and friendship:

> From the beginning, Jim's kindnesses defined what friendship could be. At one point [my wife] was alone on the mountain with our two small children, trying to replace a door on our cabin. Jim came by and spent the day with his brother-in-law installing the door. Similarly, I found that a beam supporting the cabin had cracked and was planning a repair when Jim stopped by. Jim soon returned with a truck full of equipment and material and he and his son worked with me to replace the beam over the next couple of days. When our daughter's Bat Mitzvah in Brooklyn fell on a day of an intense ice storm, the phone ringing with tens of cancellations, we were so sure Jim and Amy wouldn't be able to make it that we removed their chairs and place settings. There they were, having made the trip, extra-long and trying that day!

Ex. 23, Jed Marcus Ltr. at 1.

Jim is particularly invested in the supporting the children in his community. Scarlet believes that her father reaches out to struggling kids because he sees himself in them, and wants to give them chances he did not have:

> My dad has not only been a force of good in our community, but in the lives of several of my friends and family members as well. A good portion of my friends and classmates were directionless, and in need of help before they met my dad. Through his aid he has truly helped them turn their lives around by simply being there for them. This could mean talking to them on the phone for a few hours, helping them review their portfolios for art school, or giving them a ride to a college visit. Similarly, several relatives who went through hardships such as loss of a loved one or divorce went to

17

my dad for help, and he gave them the love and support they
needed to get back on track.

Ex. 4 at 3. <u>See</u> <u>also</u> Ex. 22 at 1 ("[Jim and Amy] are invest[ed] in the development of the whole

community of kids, rather than just that of their own children").

One of the people who Jim provided with a role model and stability is Scarlet's

boyfriend, Jonathan. Jonathan writes:

> I grew up with very few father figures. Having moved from home,
> I consider James Meyer one of three men in my life who exemplify
> the father figure I wish I had. James provides support and
> mentorship to me in ways far beyond his responsibilities as my
> girlfriend's father. He is a loving person whose empathy and
> patience is nearly limitless. . .
>
> [Jim and I] found ourselves talking about Scarlet's empathy,
> kindness, and patience. It was apparent; James raised her as a
> responsible and sensitive person. Scarlet gives everyone a second
> chance and all of the best traits I see in Scarlet, I can trace back to
> James. For a while, I considered myself a cynical and judgmental
> person. In my first few years living in NYC, I got maintenance
> workers fired, security staff yelled at, and waitresses scolded.
> However James has taught me the lesson of yielding to recognize
> the humanity in those I considered 'lazy' or 'irresponsible.' It's too
> easy to become cynical and make assumptions of the people
> passing through one's lives.

Ex. 24, Jonathan Fang Ltr. at 2. Scarlet's friend, Riley, echoes a similar gratitude when she

writes that "I lacked a strong father figure in my teen years, and Jim was the closest thing that I

had to any kind of paternal force during that crucial time. . . There is not a doubt in my mind that

if it wasn't for the support of Jim, and the fire that Amy lit under me, that I would not be where I

am now." Ex. 25, Riley Hart Ltr. at 1-2.

Finally, Scarlet describes the insight and love that her father showed to her as she grew

up and learned to navigate the fraught world of adulthood:

> Not many fathers would insist their teenage daughter accompany
> them every Thursday to a public speaking class (and truthfully, not

18

> many teenage daughters would comply) but in doing so he helped me change from a person who was too nervous to talk to waiters at restaurants, to someone who does standup comedy. My dad encouraged me to apply to NYU for film school a week before the deadline, because he knew I wanted to go and knew I wasn't trying because I was scared that I'd fail. This is because he's believed in me long before I ever did.

Ex. 4 at 2.

### 4. Jim is dedicated to his community, charity, and support of the arts

Jim is committed to improving his community, fostering support of the arts, and recognizing the potential in young people. Dozens of the letters submitted on Jim's behalf speak of his longstanding practice of giving back to his community. As his sister-in-law, Kristine, writes, "Jim cares about people and cares about community. Through his work as a founder of the Art Garage, mentoring students and assistants, serving on the local school board, teaching motorcycle safety, and leading a Boy Scout group, Jim has shown consistently that he is a positive, creative and constructive member of his community." Ex. 6 at 2; see also Ex. 26, Craig Davis Ltr. at 1. ("Jim has been a tremendous asset to our town. He has been very involved, in particular with the education of our youth"); Ex. 14 at 1-2 ("Jim has contributed in a myriad of ways working with youth through art and education . . . Jim's responsibilities and actions model his commitment to making the community the most it can be for all members"); Ex. 27, Hans Bowder Ltr. at 2 ("Every time I see Jim he is involved in a project or an endeavor to help someone").

As Jim's friend Jed explains, "[i]n his own family, Jim both displays and expects generosity, thoughtfulness and responsibility—a wonderful father and companion. We see how he has helped his children work towards their dreams—and how deeply he cares about all

children. The profound sense of dedication to the larger family of community comes to us through Jim's examples." Ex. 23 at 2.

In addition to his service to the local school board, the parks department, the Boy Scouts, and other charitable endeavors, Jim has dedicated his life to fostering the artistic potential of others. Almost all of the letters from Jim's friends and family describe his work in founding the Artgarage, an after school program that provides an art program for local students when their schools fail to do so. Kimberly Dodge Foster, one of Jim's lifelong friends, explains how important the Artgarage is to Jim and to the community:

> Jim . . . started and created the Art Garage to enhance the lacking art program for the kids in their community, trying to create the same open space for kids to express themselves that we cherished as kids in our art teacher's room; a place where we could go and be artists and be ourselves. What a gift Jim gave to his community. Jim made a real difference for the common good, but it was never done to get accolades or a pat on the back; it was done out of love and passion for art and artists, not only for his own kids but for the entire community. Jim has volunteered so much of his precious time over the years for others.

Ex. 28, Kimberly Dodge Foster Ltr. at 1. Another friend, Claire Elaine Valenti, echoes how crucial such a program is for kids who are struggling:

> I had attended the regional high school that the Artgarage today serves and was more than aware of the socio-economic challenges faced by many students there. There is no better way to support those students, from the future art majors in college, to the shy or the nonathletic, and the marginalized: I am proud to be a part of this project that Jim helped to found. The rules are clear: no bullying, make art! Many a day, I watched Jim patiently steer a student toward a specific medium, encouraging by example; he possesses that very special ability to quietly inspire. Without Jim's countless nights and weekends of behind-the-scenes sheet-rocking and painting, the kids would not have had the beautiful space in which to exhibit their work that the Artgarage today provides.

Ex. 29, Claire Elaine Valenti Ltr. at 1.

Whenever he encountered aspiring artists, Jim played a critical role in supporting their work and encouraging them in their pursuit of future careers in the art world. Robin Crofut-Brittingham, a fellow art assistant and artist, recalls Jim's critical support during the early part of her career:

> Jim is extremely humble and giving. To him it was just as important to recognize and encourage my work as a fledgling twenty-year old artist as it was to enhance his own significant art career - even at the opening of a big New York show. Through his encouragement and guidance I started to feel like I really could be an artist and I began to take my work much more seriously. When I began exhibiting my paintings he was always available for a word of advice and he and his wife always made a point of going to see my shows. . .
>
> I am now attending an MFA program in San Francisco, CA and have been exhibiting my work for a several years. I credit Jim with having a huge role in the confidence I had to build to make it here. I consider him a great mentor and a close friend. I know that I am certainly not the only young artist he has inspired and taught. He has continued to encourage and inspire me as I take steps to build a career as an artist. I highly value his friendship and advice. He is part of a close, loving family and is an asset to any community. He has helped me and many other young artists find their direction and passion. I know he will continue to play an important role in my personal and artistic development for many years.

Ex. 30, Robin Crofut-Brittingham Ltr. at 1-2.

Shayna Blumert, Scarlet's friend, recalls similar encouragement and support from Jim when she first considered a career as an artist:

> Over the years, I have come to know Jim not only as my friend's father, but as a mentor, an artist, and an active member of the local community. . . Jim offered me his guidance and advice as I attempted to navigate the world as a young artist. . . His mentorship prepared me for the experiences I would have as a member of an artistic community, in both academic and professional settings. This gave me a confidence and perspective I would not have had otherwise.

Ex. 31, Shayna Blumert Ltr. at 1-2.

21

In addition to Jim's heartbreak at the pain he has caused his family, he is also ashamed at the impact of his conduct on his community. He takes full responsibility for what he has done, and is dedicated to doing everything necessary to pay his debt to society and continue to give back. Scarlet is heartbroken by her father's situation, but maintains hope for his future:

> My dad has spent so much time helping people that he has only now at fifty-two, learned how to help himself. He has recently started to attempt to realize a dream he has harbored as long as I've known him—applying to colleges to finish his degree. For the first time in his life my dad is in therapy, and is working through deep issues that he let fall to the wayside for many years. My dad's art career is not longer relegated to the early hours of the day and instead has become his full time career. Whenever I'm with him I see that my dad is more at peace than I've seen him before, because he has deeply embraced the power of helping yourself in order to better help others.

Ex. 4 at 4.

As the letters from his family and friends make clear, Jim is a critical presence in the lives of an astounding number of people. Should he be sentenced to a term of incarceration, his absence will be felt acutely by everyone in his life. Scarlet sums up the feelings of the many people who know and love Jim when she writes: "[he] has overcome a lot in his lifetime, and is finally learning how to live as a whole emotional being. He is a force of good in the community and the lives of so many people. His life has much more of a positive impact outside in the world than behind bars. And simply put, if he is sent away, he's not the only one going there." Id.

### B.  The nature and circumstances of the offense

While the Pre-Sentence Report accurately describes the conduct to which Jim pled guilty, we provide the following information to give the Court further context for Jim's crime.  In 2003, Jim was introduced to Fred Dorfman, a modern art dealer and owner of a prominent art gallery in

22

Manhattan.[4]  Dorfman embarked on a three-year effort to convince Jim that he wanted to represent him as an independent artist separate from his employment by Jasper Johns.  Jim, who by all accounts is impressionable by nature, was drawn in by Dorfman's offer and was excited at the prospect of finding representation as an artist in his own right. Jim did not realize at the time that Dorfman never actually promoted his independent artistic talents, but rather used him to get access to Jasper Johns' artwork. Indeed, from 2003 to 2006, rather than actually sell any of Jim's art to any other galleries or collectors, (except one or two pieces that he bought himself), Dorfman repeatedly asked Jim if he had access to Mr. Johns' discarded and/or unfinished artworks that were not intended for sale, and pressured him to obtain as much of these artworks as he could so they could sell them together. Eventually, beginning in 2006, Jim acquiesced to Dorfman's plan, and began to deliver to Dorfman Jasper Johns' unfinished and discarded artwork from the Johns studio for Dorfman to sell to his contacts in the art world.[5] This was a disastrous and inexplicable decision by Jim, one that he profoundly regrets.

While by no means an excuse for his conduct, Jim's actions are explained in part by the pressures of an unscrupulous art dealer accomplice who convinced Jim to sell discarded artwork. Moreover, while Jim's crime is very serious, in many ways it is less so than other financial crimes. He did not leave anyone penniless or take anyone's life savings. The artworks at issue were meant to be destroyed—Jim did not steal artwork from a museum or private owners, or deprive anyone of the proceeds of legitimate sales. Although his actions harmed Mr. Johns'

---

[4] Dorfman is the "gallery owner" referred to in the Indictment.

[5] Notably, as Jim came to find out only after his arrest, this was not the first time Dorfman had engaged in the same conduct with art assistants to well-known contemporary artists in an effort to gain access to their artwork which would not otherwise have been available to him.

artistic control over his work, they did not result in the kinds of financial losses typically associated with crimes of this nature.

Finally, Jim's attorneys have worked closely with Mr. Johns' attorneys to recover as many of the artworks as possible and to make Mr. Johns whole. Indeed, it is our understanding that, as of the date of this submission, arrangements have been made to return a substantial number of the outstanding works to Mr. Johns.

### D.  A sentence of probation will alleviate any unwarranted sentencing disparities between co-conspirators

Section 3553(a)(6) urges courts to avoid unwarranted sentencing disparities with defendants who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Although Dorfman was not charged as a defendant in this case, he was the architect of the scheme and its primary beneficiary. Dorfman sold thirty-seven[6] pieces of Mr. Johns' work for a profit of $9,989,070. Jim accepted responsibility and pleaded guilty—not only is he facing a potential term of incarceration, but he returned all of the works in his possession, and the share of the profits he received from Dorfman will be entirely forfeited under the plea agreement. Meanwhile, Dorfman presumably kept the remaining $5,996,570—almost two thirds of the profits—from the illegal sales, and there are still five outstanding works by Mr. Johns that were never recovered.

Despite all this, Dorfman has never been indicted and thus will not face any sentence for his conduct, let alone a sentence of imprisonment. Sentencing Jim to a term of incarceration within the guidelines range of 37 to 46 months would create an enormous and unwarranted disparity with Dorfman, who will receive no punishment at all.

### E.  A sentence of probation would provide adequate deterrence

#### 1.  Specific deterrence

There can be no meaningful argument that Jim poses a threat to commit any further crime, let alone that incarceration is needed to prevent him from doing so. The life and community Jim worked so hard to build has been destroyed by his conduct. He has already suffered severe consequences as a result of his arrest and conviction, irrespective of a possible

---

[6] Dorfman sold thirty-seven of the forty-two pieces in his possession. The location of the remaining five pieces is unknown at this time.

26

prison term; the stigma of his felony conviction and the wide publicity his case has garnered will make it extremely difficult to find work, and Jim has almost no chance of ever again working in the one field to which he has dedicated his life. Jim has lost the trust and respect of his loved ones, friends, and neighbors, and has been shut out of the art world. Jim lives in a small town and the scrutiny to which he is subjected is incessant—he has no chance of anonymity, and the repercussions of his misconduct have affected the lives of his wife, children, and everyone close to him. Jim's case has been the subject of an editorial on the front page of his local newspaper, in addition to media coverage in the press at large. He knows that his life will never be the same, and that it is entirely his fault.

Most distressingly, Jim is devastated by the toll his actions have taken on his family. Amy is a teacher at a local school, and has faced enormous embarrassment at her job as a result of her husband's actions. Scarlet and Forrest not only face the prospect of losing their father—and his critical support—during this important stage of their young lives, but they too have experienced shame, embarrassment, and scrutiny within their social and professional circles just as they are starting to make their way in the world.

In addition to the severe consequences Jim has already suffered and will suffer if he is to serve a term of incarceration, the criminal forfeiture provision of his plea agreement is a significant additional punishment for his conduct that will substantially impact his family's financial health. Because the financial component of his plea agreement will wipe out his family's assets, Amy will have to completely start over and pay the family's expenses on her salary alone. Not only Jim will suffer years of lost wages if he is to serve a term of incarceration, his future earnings, if any, will be greatly diminished by the stigma of his conviction, and his family will be compelled to completely start from scratch. Jim and Amy now face an entirely

27

different financial future than the one they worked their entire lives to build. Although this outcome is the direct result of Jim's actions, it is a serious blow nonetheless. The criminal forfeiture provision of Jim's plea agreement, and any restitution the Court may order, should properly be recognized as a significant component of his punishment, and will strongly dissuade others from engaging in similar conduct. See 18 U.S.C. § 3553(a); see also United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (financial penalties are a significant component of punishment in fraud cases).

These consequences are more than adequate to prevent Jim from ever again engaging in similar activity, and we respectfully submit that he poses no danger to the public whatsoever. Jim has no criminal record, and has complied with all the conditions of his pretrial release without exception. He has done everything he can to right this wrong. He must now pick up the pieces of his life, and has been subsisting on the proceeds of carpentry work while looking for employment. Jim's offense conduct is entirely at odds with his character and the behavior he has exhibited throughout the rest of his life, as the letters submitted on his behalf overwhelmingly demonstrate.  Jim will probably never live down the shame and remorse he feels over what he has done. A sentence of incarceration is unnecessary to prevent Jim from future criminal conduct.

### 2.  General deterrence

Regardless of the Court's sentence, Jim will never be perceived by anyone in or outside the art world as having escaped punishment for his crime. The disastrous consequences that have resulted from Jim's actions are widely known throughout the art world and throughout the media generally. Jim's ignominy already provides broad deterrence to anyone contemplating engaging in similar conduct, and thus a term of incarceration is unnecessary.

**F.   A sentence of probation would be sufficient, but not greater than necessary, to achieve the goals of sentencing**

Section 3553(a)(2) requires the Court to consider whether the contemplated sentence is sufficient—but not greater than necessary—to reflect the seriousness of the offense, promote respect for the law and provide just punishment, protect the public from further crimes of the defendant, and afford adequate deterrence. 18 U.S.C. § 3553(a)(2). All of these factors weigh in favor of probation in this case.

Jim acknowledges that he committed a serious crime. However, it is important for the Court to take into account the relative severity of his crime and to consider it in context. As discussed above, Jim took Mr. Johns' discarded works that were meant to be destroyed and sold them without permission. As noted above, he did not steal artwork from a museum, or from private owners, nor did he deprive anyone of the proceeds from the art. Finally, he returned all of the artworks that he could and continues to do everything he can to recover and return the rest. While Jim's offense harmed Mr. Johns' artistic control over his work, he did not engage in a scheme to defraud Mr. Johns of income. There is no excuse for what Jim did, and the harm he caused was very real, but his conduct did not result in the kind of financial loss typically associated with cases of this kind.

Jim has already lost everything he worked for his entire life, and it is entirely his fault. He is now a convicted felon, will never be able to work in his beloved profession, and has been ostracized from his community. Worst of all, the toll that Jim's conduct has exacted on his marriage and his family has been enormous, and for this he will likely never be able to forgive himself. However, the family is committed to supporting one another and is getting through this difficult time together.  Amy assures the Court that "Jim is fully aware of his failings and the challenges that lie ahead. The fact that he has been able to maintain or build (and rebuild, where

29

necessary) strong and good relationships with his parents, wife, children, family members, and

those of his community, indicate that Jim is, and will continue to be, a worthy and treasured

man." Ex. 5 at 4. As Scarlet explains:

> My family is strong. We've been through a lot in the last year, and
> though it's been hard on us emotionally, we've kept the most
> important thing intact—our love for one another. And though this
> is true, every day I wake up terrified at what my world will look
> like without my dad in my life. I wonder what I will do if I can't
> call him whenever I need him, what my home will feel like without
> his presence, what my emotional landscape will look like after any
> amount of time in his absence. My parents are deeply in love. They
> care for each other more strongly than any couple I've ever known.
> I worry about what will happen to my mother's heart if she has to
> live alone without my dad by her side. My brother is twenty years
> old and just coming into his own. He is a lot like me, naturally shy
> and withdrawn, with a penchant for keeping his emotions close to
> the belt. I worry that losing my dad might hurt him irrecoverably in
> ways he won't ever be able to express. And finally I worry about
> my dad, because he is a good, caring man, who has overcome a
> great deal of pain and adversity in his life and chosen to spend it
> helping others.

Ex. 4 at 4.

## II.   NO FINE SHOULD BE IMPOSED

We respectfully submit that a fine is not warranted given the circumstances of this case.

As discussed above, the forfeiture provision of Jim's plea agreement is a significant penalty in

and of itself that will wipe out his family's assets. Jim and Amy have always made a modest

living in their careers in the worlds of art and education, and do not have significant savings.

Jim's earning capacity may be destroyed permanently as a result of his conviction, and the

family will be compelled to make ends meet solely based on Amy's salary as a teacher.

Moreover, 18 U.S.C. § 3572 requires courts to consider a number of additional factors in

determining whether to impose a fine, including, among other things, the defendant's income,

earning capacity, and financial resources, and the burden that the fine will impose upon the

defendant and his family. <u>See</u> 18 U.S.C. § 3572. Given these considerations, and the fact that Jim

and his family will be rendered insolvent by the other financial penalties in his plea agreement,

we respectfully submit that a fine is not warranted here.

<b><u>CONCLUSION</u></b>

Jim has taken responsibility for his conduct and is ready to accept a just sentence for his

offense. He is deeply remorseful and understands that the hardships he has brought upon himself

and his family are entirely of his own doing. Jim will regret the decisions that brought him to this

point for the rest of his life. We ask only that the Court consider the generosity, loyalty, and

compassion that have otherwise characterized Jim's life, and the extent to which his family,

friends, and community love and depend on him, before imposing sentence.

Dated:  January 9, 2015                        Respectfully submitted,
      New York, New York

                                      <u>s/ Morris J. Fodeman, Esq.</u>
                                        Morris J. Fodeman, Esq.
                                        Megan E. Wall-Wolff, Esq.
                                        WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
                                        1301 Avenue of the Americas, 40th Floor
                                        New York, New York 10019
                                        Telephone:  (212) 999-5800
                                        Facsimile:  (212) 999-5899
                                        mfodeman@wsgr.com

                                        Donna G. Recant, Esq.
                                        230 Park Avenue, Suite 440
                                        New York, New York 10169
                                        Telephone:  (212) 422-0000
                                        drecantlaw@gmail.com

                                        *Attorneys for Defendant James Meyer*

**Exhibit List**

| Exhibit No. | Exhibit Description |
|:---:|:---|
| 1 | Plea Agreement |
| 2 | Jim Meyer Letter |
| 3 | Dorothy Meyer Letter |
| 4 | Scarlet K. Meyer Letter |
| 5 | Amy C. Jenkins Letter |
| 6 | Kristine Jenkins Letter |
| 7 | Linda S. Jenkins Letter |
| 8 | Alanna Mulligan Letter |
| 9 | John M. Fitz Letter |
| 10 | Forrest Meyer Letter |
| 11 | Vera L. Bergeron Letter |
| 12 | Kirsten Hunter Letter |
| 13 | Charles Meyer Letter |
| 14 | Beverly Behrmann Letter |
| 15 | Carol Jenkins Letter |
| 16 | Eric Jenkins Letter |
| 17 | Kathryn A. Stater Letter |
| 18 | Ann Arrensberg Letter |
| 19 | Patrick Bishow Letter |
| 20 | Christopher Baetz Letter |
| 21 | Anne Day Letter |
| 22 | Amanda Hower Letter |
| 23 | Jed Marcus Letter |
| 24 | Jonathan Fang Letter |

| Exhibit No. | Exhibit Description |
| --- | --- |
| 25 | Riley Patterson Hart Letter |
| 26 | Craig Davis Letter |
| 27 | Hans Bowder Letter |
| 28 | Kimberly Dodge Foster Letter |
| 29 | Claire Valenti Letter |
| 30 | Robin Crofut-Brittingham Letter |
| 31 | Shayna Blumert Letter |
| 32 | Margaret Betrand Letter |
| 33 | Robin Cockerline Letter |
| 34 | Erika Crofut Letter |
| 35 | Charlotte Cooper Letter |
| 36 | Eileen Cullen Letter |
| 37 | Cecilia Whittaker-Doe Letter |
| 38 | Don Doe Letter |
| 39 | Michael Fredericks Letter |
| 40 | Katherine Freygang Letter |
| 41 | Sidney Mackenzie Fulop Letter |
| 42 | Dr. David Gdula Letter |
| 44 | Tit Halle Letter |
| 45 | Mary Mitchell Hinchman, Ph.D. Letter |
| 46 | Dina Hofstetter Letter |
| 47 | Vanessa Hoheb Letter |
| 48 | Charlotte Hower Letter |
| 49 | Chiara Ruth Jenkins Letter |
| 50 | Thomas Jenkins Letter |

| Exhibit No. | Exhibit Description |
|:---:|---|
| 51 | Paul Kline Letter |
| 52 | Charles Kulsziski Letter |
| 53 | Diane Gdula Larsen Letter |
| 54 | Allison G. Lassoe Letter |
| 55 | Laureen A. McNamara Letter |
| 56 | Louise M. Millmann Letter |
| 57 | Patricia Mooney Letter |
| 58 | Katherine Perry Letter |
| 59 | Danielle Phillips Letter |
| 60 | George Reamy Letter |
| 61 | Doris Rowe Letter |
| 62 | Jane Santana Letter |
| 63 | Joel Schapira Letter |
| 64 | Jane Snyder Letter |
| 65 | Emily Soper Letter |
| 66 | Lisa Strauss Letter |
| 67 | Robin Sweeney Letter |
| 68 | Jacqueline Toscano Letter |
| 69 | Andrew Watel Letter |
| 70 | Anne G. Williams Letter |